UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Engineering & Construction Innovations, Inc., | Case No. 20-cv-0808 (WMW/TNL) |
| *Plaintiff/Counterclaim-Defendant*, | **ORDER** |
| v. | |
| Bradshaw Construction Corporation, and Travelers Casualty and Surety Company of America, | |
| *Defendants/Counterclaim-Plaintiffs*, | |
| v. | |
| Fidelity and Deposit Company of Maryland, and Zurich American Insurance Company, | |
| *Counterclaim-Defendants*. | |

This matter is before the Court on the parties' cross-motions to exclude expert testimony, (Dkts. 309, 315, 328), and cross-motions for summary judgment (Dkts. 323, 334). For the reasons addressed in this Order, Defendants' motion to exclude the testimony of Arthur McGinn is denied; Defendants' motion to exclude the testimony of Mark Gentry is denied; Engineering & Construction Innovations, Inc.'s ("ECI") motion to exclude the testimony of Donald Bergman is granted to the extent that Bergman's opinions on engineering and geological topics are beyond his area of expertise and denied in all other respects; ECI's motion to exclude the testimony of Kimberlie Staheli is denied; and ECI's motion to exclude the testimony of Scott Bender is denied. As addressed in this Order,

Defendants' motion for summary judgment is denied, and ECI's motion for summary judgment is granted in part and denied in part.

## BACKGROUND

### I.    The 10th Avenue Water Main River Crossing Project

The City of Minneapolis ("City") planned to install a water main under the Mississippi River as part of the City's 10th Avenue Water Main River Crossing Project ("Project"). The Project required the construction of a microtunnel through the sandstone beneath the Mississippi River. Microtunneling is a form of mechanized tunnel construction that uses a remote-controlled microtunnel boring machine ("MTBM") to construct a tunnel and simultaneously install pipe casing with minimal disruption to the ground above.

To prepare for the Project, Black & Veatch Corporation ("Black & Veatch") conducted a geotechnical investigation of the Project Site and prepared two geotechnical reports. The Geotechnical Data Report ("GDR") presented factual details, data and the result of the investigation. The Geotechnical Baseline Report ("GBR") took the information in the GDR and established a "contractual statement of the subsurface conditions" on the Project Site, "referred to as the baseline conditions." (Dkt. 338-1 at 57.) The GBR expressly "establishes the allocation of risk between Contractor and Owner for the actual conditions encountered." (*Id.* at 60.) If the actual subsurface conditions materially differ from the subsurface conditions as expressly described in the GBR, the

2

contractor can make a claim for a differing site condition ("DSC").[1]  The GBR "provides the basis for determining the merit of claims for differing site conditions."  (*Id.*)  These documents were published to bidders on the Project and expressly included in the contract documents.

ECI successfully bid on the Project and, in March 2019, ECI entered into an agreement ("Prime Contract") with the City.  Under the Prime Contract, ECI agreed to "provide all materials, labor, equipment and incidentals necessary for the 10th Avenue Water Main River Crossing Project, all in accordance with the bid specifications[.]"  (Dkt. 338-1 at 33.)  ECI decided to subcontract the microtunneling portion of the work to another party.  In soliciting bids for the microtunneling work, ECI provided bidding subcontractors instructions that incorporated the Project's specifications and included the GDR and GBR.

Bradshaw Construction Corporation ("Bradshaw") submitted a successful bid for the microtunneling work on the Project, and ECI and Bradshaw entered into an agreement on May 30, 2019 ("Subcontract").  Under the Subcontract, Bradshaw agreed "to provide all labor, materials, services, and equipment to perform the following scope of work on the Project: Install 60" steel Casing via Microtunneling."  (Dkt. 338-3 at 2.)  As part of the Subcontract, Bradshaw was "solely responsible for the means, methods, techniques, sequences, and procedures" of performing its microtunneling work."  (*Id.* at 44.)  The Subcontract's estimated schedule called for Bradshaw to achieve substantial completion of

---

[1] "Differing Site Condition" occurs when a construction contractor encounters a subsurface or otherwise concealed site condition that differs materially from what the contract indicated or from what would normally be expected.

the work by November 22, 2019.  ECI agreed to pay Bradshaw approximately $2.6 million upon completion of the Subcontract.

## II.    The Microtunneling Work

Around October 2019, Bradshaw's portion of the work began.  Bradshaw constructed the concrete head wall—a structure that would be used to launch the MTBM.  After the completion of the concrete head wall, Bradshaw commenced the microtunneling process on November 7, 2019.  That evening, groundwater unexpectedly penetrated the shaft and flooded the tunnel.  The groundwater overwhelmed the pumps in the shaft and submerged the tunneling equipment, which forced Bradshaw to stop tunneling.

### A.    Change Orders and DSC Claims

As part of the Standard General Conditions of the Construction Contract, any changes in time or prices required a change order.  Moreover, in making a DSC claim, the contractor "shall, promptly after becoming aware thereof and before further disturbing the subsurface conditions or performing any work in connection therewith . . . notify Owner and Engineer in writing about such condition no later than three (3) days after the first observance of such condition."  Additionally, a contractor "shall not be entitled to any adjustment in the Contract Price or Contract Times with respect to a subsurface or physical condition if . . . [the] Contractor failed to give the written notice as required."  (Dkt. 338-4 at 14.)

On November 15, 2019, Bradshaw sent a letter to ECI:

> Due to the groundwater flows encountered on the project being in excess of what is indicated in the Geotechnical Baseline Report, please accept this letter as notification of differing site

4

> conditions. Bradshaw hereby reserves the right to claim for the extra costs and extra time associated with these differing site conditions.
>
> Please forward this notification on to the owner/engineer. I am available to discuss this matter at your convenience.

("First DSC Claim") (*Id.* at 30).

On November 16, 2019, an internal email between Bradshaw employees stated:

> I just found in the Supplementary Conditions there is a 3 day notice provision for a DSC claim. Why do you think it is 14 days? I hope so we arguably have lost any claim rights for this flood that we may have had.

(Dkt. 337-1 at 239.)   Around November 26, 2019, Bradshaw employees discussed this issue with Bradshaw's attorney, who also advised that the claim needed to be submitted to Black & Veatch and the City.  Shortly, thereafter, Bradshaw submitted the First DSC Claim to Black & Veatch and the City.

On November 23, 2019, Bradshaw recommenced microtunneling but stopped on December 6, 2019, because of a second flood.  On December 13, 2019, Black & Veatch rejected the First DSC Claim.  Black & Veatch determined the cause of the flooding was not due to differing subsurface conditions.  Instead, Black & Veatch determined that the failure of the concrete head wall caused the flooding.  On December 18, 2019, Bradshaw appealed Black & Veatch's denial.  Black & Veatch rejected Bradshaw's appeal on February 4, 2020.

On December 29, 2019, Bradshaw resumed tunneling.  After a few feet, Bradshaw encountered high jacking loads[2] that prevented Bradshaw from making any significant progress.  On January 1, 2020, Bradshaw decided to stop tunneling.  On January 4, 2020, Bradshaw submitted another DSC claim ("Second DSC Claim"), which Black & Veatch denied on February 13, 2020.

Pursuant to the Prime Contract, the City issued a Notice of Request for Replacement Microtunneling Subcontractor to ECI on February 25, 2020.  ECI terminated Bradshaw the following day, alleging material breaches of contract.  ECI subsequently engaged Akermann, Inc., to complete the Project.

## III.    The Lawsuit

In March 2020, ECI sued Bradshaw and Travelers, Bradshaw's surety, in Hennepin County District Court.  Defendants subsequently removed the case to the United States District Court for the District of Minnesota.  In answering the complaint, Bradshaw brought eight counterclaims against ECI.

On November 21, 2022, Defendants moved to exclude the expert testimony of Arthur McGinn and Mark Gentry.  ECI subsequently moved to exclude the expert testimony of Donald Bergman, Kimberlie Staheli and Scott Bender.  Defendants also moved for partial summary judgment as to certain damages ECI that ECI contends Bradshaw owes.  ECI moved for summary judgment motion on Bradshaw's crossclaims.

---

[2] High jacking loads are a severe counterforce that could damage the MTBM if the microtunneling continued.

## IV.    Relevant Portion of the Contracts

Section 18.09 of the Prime Contract states:

> The parties also recognize the delays, expenses, and difficulties involved in proving in a legal or arbitration proceeding the actual loss suffered by Owner if the Work is not completed on time.  Accordingly, instead of requiring any such proof, Owner and Contractor agree that as liquidated damages for delay (but not as a penalty) contractor shall pay Owner [$5,000 per day if the work is not substantially complete].

(Dkt. 326-5 at 27.)  Section 2(c) of the Subcontract states:

> If the Contract Documents provide for liquidated damages, then Subcontractor will be responsible for the portion of such liquidated damages caused by Subcontractor's delayed or deficient work pursuant to the Indemnifications paragraph (¶ 6) that Subcontractor agrees are reasonable.

(Dkt. 326-8 at 2.)  Section 6 of the Subcontract provides that:

> Subcontractor will defend, indemnify and save harmless Contractor and Owner, and their respective officers, directors and agents, to the fullest extent of the law, from any and all claims, damages, and expenses, in whole or part, including costs, expert fees, and reasonable attorney's fees, bodily injury or property damage, arising or in any way resulting from . . . [a]ny other liability to Owner or Contractor that Subcontractor caused including Liquidated Damages.

(Dkt. 326-8 at 5.)   And under section 9 of the Subcontract, "[u]pon breach, Contractor . . . may charge to [Subcontractor] any cost to complete, correct or becomes owed to Owner, plus damages from delay or disruption, plus liquidated or actual damages caused by Subcontractor's breach."  (Dkt. 326-8 at 6.)

ECI argues that Bradshaw owes ECI $7,575,651 in total damages, which is comprised of $250,691 in Additional ECI Pre-Termination Costs, $3,245,562 in Additional

ECI Microtunneling Related Costs and $1,246,168 in Extended General Conditions damages. It also includes Overhead and Profit of $785,819 and City of Minneapolis Damages of $2,047,411. The category identified as "City of Minneapolis Damages" represents the portion of liquidated damages for which Defendants are allegedly liable. The "Extended General Conditions" damages are the daily costs expended from the delay.

## ANALYSIS

**I.     Daubert Motions**

The admissibility of expert testimony presents an issue of law governed by Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. "An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed." Fed. R. Evid. 703. "If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted." *Id.*

The proponent of expert testimony must prove its admissibility by a preponderance of the evidence. *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001). "Rule 702 reflects an attempt to liberalize the rules governing the admission of expert testimony" and favors admission over exclusion. *Id*. (internal quotation marks omitted). The determination as to the admissibility of expert testimony is within a district court's sound discretion. *See Arkwright Mut. Ins. Co. v. Gwinner Oil, Inc.*, 125 F.3d 1176, 1182 (8th Cir. 1997).

A district court must ensure that testimony admitted under Rule 702 "is not only relevant, but reliable." *Daubert*, 509 U.S. at 589. When making the reliability determination, a court may evaluate whether the expert's method has been tested or subjected to peer review and publication, the method's known or potential rate of error, and the method's general acceptance. *Presley v. Lakewood Eng'g & Mfg. Co.*, 553 F.3d 638, 643 (8th Cir. 2009) (citing *Daubert*, 509 U.S. at 593–94). These factors are not exhaustive, and a court must evaluate the reliability of expert testimony based on the facts of the case. *Id.* A court also may consider "whether the expertise was developed for litigation or naturally flowed from the expert's research; whether the proposed expert ruled out other alternative explanations; and whether the proposed expert sufficiently connected the proposed testimony with the facts of the case." *Sappington v. Skyjack, Inc.*, 512 F.3d 440, 449 (8th Cir. 2008) (internal quotation marks omitted). When weighing these factors, a district court must function as a gatekeeper to separate "expert opinion evidence based on 'good grounds' from subjective speculation that masquerades as scientific knowledge." *Glastetter v. Novartis Pharm. Corp.*, 252 F.3d 986, 989 (8th Cir. 2001).

Expert testimony is not admissible if it is "speculative, unsupported by sufficient facts, or contrary to the facts of the case," *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 757 (8th Cir. 2006), such that the testimony is "so fundamentally unsupported that it can offer no assistance to the jury," *Minn. Supply Co. v. Raymond Corp.*, 472 F.3d 524, 544 (8th Cir. 2006) (internal quotation marks omitted). But disputes about the factual basis of an expert's testimony ordinarily implicate the credibility—not the admissibility—of the testimony. *Sappington*, 512 F.3d at 450; *see also Minn. Supply Co.*, 472 F.3d at 544.

Both parties move to exclude expert testimony. Defendants move to exclude the expert testimony of Arthur McGinn and Mark Gentry. ECI moves to exclude the expert testimony of Donald Bergman, Kimberlie Staheli and Scott Bender.

### A.  Arthur McGinn

#### 1.  McGinn's Qualifications

Arthur McGinn is an engineer that ECI retained as an expert. Defendants argue that McGinn is not qualified to testify as an expert witness regarding microtunneling and his testimony should be excluded entirely because McGinn has worked on only two microtunneling projects in the past. ECI disagrees, highlighting McGinn's credentials and arguing that any limited experience goes to the weight of the testimonial evidence not McGinn's qualifications to testify as an expert witness.

McGinn has a Ph.D. in Geotechnical Engineering, a master's degree in civil engineering and is professionally licensed in six states and the District of Columbia. McGinn has over 25 years of relevant work experience, and he has worked on two microtunneling projects in the past. Based on McGinn's "knowledge, skill, training [and]

10

education," the Court concludes that McGinn qualifies as an expert. Fed. R. Evid. 702. Any gaps in McGinn's experience in microtunneling go to the weight of his opinion, not to its admissibility. *See Robinson v. GEICO Gen. Ins. Co.*, 447 F.3d 1096, 1100 (8th Cir. 2006). Accordingly, the Court denies Defendants' motion to exclude McGinn's testimony as it pertains to this argument.

### 2.   *McGinn's Testimony on Ground Permeability and Muck Ring Return Rates*

Alternatively, Defendants contend that McGinn's testimony on the topics of ground permeability and muck ring return rates should be excluded because McGinn's testimony is unreliable. Defendants maintain that McGinn failed to adequately disclose the basis for his opinion as required by Rule 26(a)(2)(b), Fed. R. Civ. P. ECI responds that McGinn's opinions are adequately supported by the record. ECI also argues that Defendants' *Daubert* motion is a veiled discovery motion that should have been brought by October 21, 2022.

Here, it is unclear if Defendants brought this motion to exclude testimony under Rule 702, Fed. R. Evid., or Rule 37(a), Fed. R. Civ. P. Defendants' arguments begin with a reference to Fed. R. Evid. 702, but the argument pivots to an exclusion analysis under Rule 37(a), Fed. R. Civ. P. In their response memorandum, Defendants clarify that they are arguing that exclusion is required under Fed. R. Evid. 702. But Defendants provide no corrected analysis.

To the extent that Defendants argue that exclusion is required under Rule 702, Fed. R. Evid., there is no basis for exclusion. Expert testimony is not admissible if it is "speculative, unsupported by sufficient facts, or contrary to the facts of the case," *Marmo,*

457 F.3d at 757, such that it is "so fundamentally unsupported that it can offer no assistance to the jury," *Minn. Supply Co.*, 472 F.3d at 544.  At his deposition, McGinn testified that his conclusions regarding ground permeability and muck ring return rate were based on calculations that he performed in connection with other projections that were located near the Project site in this case.  As such, the Court concludes that McGinn's testimony is based on sufficient facts and data.  Therefore, Defendants' motion to exclude McGinn's testimony on this ground is denied.

To the extent that Defendants rely on Rule 37(a), Fed. R. Civ. P., this motion to strike is untimely.  The scheduling order required "[a]ll non-dispositive motions and supporting documents which relate to expert discovery [to] be filed and served on or before October 21, 2022."  (Dkt. 288 ¶ 4.)  Defendants brought this motion on November 21, 2022.  Defendants offer no explanation for the untimely filing.  Therefore, to the extent that Defendants move to strike under Rule 37(a), the motion is denied.

### B.   *Mark Gentry*

Mark Gentry is ECI's scheduling and damages expert.  Defendants seek to exclude Gentry's expert testimony, arguing that Gentry's damages calculation is inconsistent with the Subcontract and established damages principles.  Particularly, Defendants challenge Gentry's inclusion of ECI's lost Overhead and Profit in the overall calculation.  Exclusion is unwarranted, ECI argues, because Gentry's calculation is fundamentally supported.

First, Defendants contend that Gentry's calculation is not based on sufficient facts or data because the calculation is inconsistent with the Subcontract.  This argument is based

on Defendants' interpretation of the contract, which is an issue for the trier of fact. Such disputes are not properly resolved in the context of a *Daubert* motion.

Second, Defendants maintain that Gentry's calculation is fundamentally unsupported by the record because Gentry simply relies on ECI's calculations. Defendants take issue with Gentry's reliance on the 16.57% rate for ECI's Overhead and Profits calculated by ECI's former chief financial officer. ECI contends this rate was derived from discussion with the former CFO and review of the Project's financial records. This challenge to the factual basis of Gentry's conclusions implicates credibility, not the admissibility, of the testimony. *See Sappington*, 512 F.3d at 450. As such, the Court denies Defendants' motion to exclude Gentry's testimony.

### C.    *Donald Bergman*

Donald Bergman is the Chief Estimator for Frank Coluccio Construction Company and has experience in planning and bidding on microtunneling projects. Defendants retained Bergman for the purpose of explaining the technical language of the industry. ECI argues that Bergman's testimony should be limited to the reasonableness of Bradshaw's bid on the project. ECI maintains that Bergman's expert report provides inadmissible legal conclusions, unqualified opinions on engineering and geological topics, improper opinions on whether the DSC claims were properly rejected, an unhelpful recitation of the facts, and irrelevant opinions regarding Test Borings. Defendants do not dispute that Bergman cannot provide inadmissible legal conclusions. But Defendants oppose the motion to exclude Bergman's testimony, arguing that they will not illicit any inadmissible legal

conclusions at trial.  Defendants contend that Bergman's testimony on these other subjects is admissible.  These issues are addressed in turn.

### 1.     *Inadmissible Legal Conclusions*

Portions of Bergman's expert testimony should be excluded because he provides inadmissible legal conclusions, ECI contends.  "As a general rule, questions of law are the subject of the court's instructions and not the subject of expert testimony."  *United States v. Klaphake*, 64 F.3d 435, 438 (8th Cir. 1995) (internal quotation marks omitted); *accord S. Pine Helicopters, Inc. v. Phoenix Aviation Managers, Inc.*, 320 F.3d 838, 841 (8th Cir. 2003) ("[E]xpert testimony on legal matters is not admissible.").  Expert testimony about the requirements of the law is improper because it "would give the appearance that the court was shifting to witnesses the responsibility to decide the case."  *Portz v. St. Cloud State Univ.*, 297 F. Supp. 3d 929, 952 (D. Minn. 2018) (internal quotation omitted).  The construction of the terms and conditions of written contracts presents an issue of law for the trial court to determine.  *Weitz Co. v. Lexington Ins. Co.*, 786 F.3d 641, 646 (8th Cir. 2015).

Here, both parties agree that Bergman's legal conclusions are inadmissible.  ECI's arguments are broadly stated and do not identify the legal conclusions that it seeks to exclude.  Moreover, Defendants maintain that they will avoid eliciting these statements from Bergman.  As there is no dispute before the Court at this time, the Court denies the motion as moot.

### 2.   Opinions on Engineering and Geological Topics

ECI seeks to exclude Bergman's opinions regarding engineering and geological topics, arguing that Bergman is unqualified to speak on these topics. ECI challenges Bergman's conclusions regarding the shaft constructed by ECI and seal constructed by Bradshaw. Bergman has five decades of experience in the planning and bidding on microtunneling projects. The extent to which this work pertains to engineering and geological topics is unclear. Bergman concedes that "[he is] not a [professional engineer], [he is] not a hydrologist, nor [is he] a geological [professional engineer]." (Dkt. 332-1 at 132:10-132:19.) Nothing in the record establishes that Bergman's opinions are supported by any scientific, technical or specialized knowledge that would help the trier of fact understand the evidence or determine a fact at issue. *See* Fed. R. Evid. 702. Rather, Bergman's opinions are based on his own personal opinions and conclusions from his review of documents and photos provided to him. The record is insufficient as to Bergman's qualifications to opine on these two topics and how he arrived at his conclusions. Accordingly, the Court concludes that Bergman lacks the background to opine on engineering and geological topics. For these reasons, ECI's motion to exclude Bergman's testimony on engineering and geological topics is granted.

### 3.   Opinions on Whether DSC Claims Were Properly Rejected

ECI seeks to exclude all of Bergman's testimony regarding DSC claims because Bergman did not evaluate what the actual subsurface conditions were. Specifically, ECI takes issue with Bergman's opinions on whether the DSC claims have been properly filed and whether the claims have been responded to properly. Bergman has over 28 years of

experience in addressing DSC claims.  Bergman's DSC opinions are formed from his review of the claim and his understanding of industry practices.  Based on his work experience with DSC claims, the Court concludes that Bergman is qualified to opine on the DSC claims.  Moreover, knowledge and methodology pertain to the weight that the jury accords Bergman's testimony, not its admissibility.  *See Miles v. Gen Motors Corp.*, 262 F.3d 720, 724 (8th Cir. 2001).  ECI's motion to exclude Bergman's DSC testimony is denied.

### 4.    *Statements Regarding Facts*

ECI argues that Bergman's testimony is unhelpful because he merely recites the factual record and, for this reason, ECI seeks to exclude Bergman's statements regarding facts.  "[A]n expert who simply 'draws inferences or reaches conclusions within the jury's competence' does not provide 'helpful testimony' under Rule 702."  *Somnis v. Country Mut. Ins. Co.*, 840 F. Supp. 2d 1166, 1173 (D. Minn. 2012) (citing *Nichols v. Am. Nat'l Ins. Co.*, 154 F.3d 875, 883 (8th Cir.1998)).  Because expert evidence can be both powerful and quite misleading, the Court must be particularly careful to exclude expert testimony if it might lead the jury to simply rely on the expert's opinion and "surrender its own common sense."  *Westcott v. Crinklaw*, 68 F.3d 1073, 1076 (8th Cir.1995).

The parties agree that Bergman cannot simply recite the facts.  They disagree, however, as to the extent that Bergman is doing so.  Defendants maintain that Bergman's recitation of the facts provides the foundation for his opinions.  But it is difficult to ascertain at this time what specific facts Bergman will be stating to the jury and what facts he will be providing as the foundation for his opinion.  This dispute is more appropriately resolved

at trial.  Therefore, ECI's motion to exclude Bergman's testimony that simply recites facts is denied.

### 5.      *Opinions Regarding Test Borings*

ECI also seeks to exclude Bergman's opinions regarding test borings, arguing he does not provide any relevant opinion on the matter.  Specifically, ECI contests Bergman's opinion that "the [geotechnical baseline report] might have benefited from additional borings.]"  (Dkt. 332-1 at 141:19-146:17.)  Defendants contend that Bergman's opinions are relevant.

Evidence is relevant if it has any tendency to make a fact more or less probable than it would be without the evidence and the fact is of consequence in determining the action. Fed. R. Evid. 401.  Bergman's opinion is relevant because it pertains to whether ECI's rejection of Bradshaw's DSC claims was reasonable under the contract.  Accordingly, ECI's motion to exclude Bergman's opinion regarding test borings is denied.

### D.      *Kimberlie Staheli*

Kimberlie Staheli is a construction expert for Defendants.  ECI does not challenge Staheli's qualifications as an expert witness.  Rather, ECI argues that Staheli's opinions about the Project's subsurface conditions are unreliable because neither Staheli nor Defendants physically inspected the Project's subsurface.

Staheli provides a detailed account of the methodologies she employed to examine the subsurface conditions at the Project.  ECI argues that Staheli's testimony is insufficient because she opined that the three best and most accurate methods to investigate the presence of voids in a particular subsurface location would be vertical borings, ground

penetrating radar and cross-hole tomography.  And Staheli concedes that these methods were not used because of costs.

 "An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed."  Fed. R. Evid. 703.  "If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted."  *Id.*  ECI does not appear to argue the methods employed by Staheli are insufficient.  Rather, ECI maintains that these methods were not the best and most accurate methods that Staheli identified.  Staheli's knowledge and methodology pertain to the weight that the jury accords her testimony rather than its admissibility.  *See Miles,* 262 F.3d at 724.  For this reason, ECI's motion to exclude Staheli's expert testimony is denied.

### E.    *Scott Bender*

Scott Bender is Defendants' hydrogeology expert.  ECI does not challenge his ability to testify as an expert witness.  Rather, ECI argues that Bender's opinions about grouting are unreliable because he lacks the appropriate licensure or certification.

Bender has experience working with a variety of grouts.  As a result of this experience, he is knowledgeable about what will infiltrate porous media.  Gaps in Bender's qualifications, however, pertain to the weight of Bender's opinion, not to its admissibility.  *Robinson*, 447 F.3d at 1100.  Accordingly, ECI's motion to exclude Bender's expert testimony is denied.

## II.   Summary Judgment

Summary judgment is proper when the moving party establishes that there is no genuine dispute as to any material fact and the moving party "is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1968).  When considering a motion for summary judgment, the court views the evidence and any reasonable inferences to be drawn from the evidence in the light most favorable to the nonmoving party.  *Krenik v. Cty. Of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995).

Whether a fact is "material" is assessed under the governing substantive law. *Anderson*, 477 U.S. at 248.  Summary judgment is not appropriate where a dispute about a material fact is "genuine," *i.e.*, "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id*.

The party seeking summary judgment bears the initial burden of production.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  When the moving party carried its burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Scott v. Harris*, 550 U.S. 372, 380 (2007), or rest on "the mere allegations or denials." *Anderson*, 477 U.S. at 248.  The nonmoving party must cite with particularity those aspects of the record that support the assertion that a fact is genuinely disputed.  Fed. R. Civ. P. 56(c)(1)(A).

### A.   Defendants' Summary Judgment Motion

In their motion for partial summary judgment, Defendants maintain that ECI cannot recover "actual delay" damages and liquidated damages under the Subcontract, ECI lacks

standing to recover damages related to the change order and ECI's claim for liquidated damages on behalf of the City are not ripe. Each argument is addressed in turn.

### 1.   Actual Damages and Liquidated Damages under the Subcontract.

Defendants contend that ECI cannot recover actual damages and liquidated damages under the Subcontract because the Subcontract does not permit the simultaneous recovery of these damages. It is undisputed that the Subcontract incorporates an enforceable liquidated damages clause from the Prime Contract. And the Subcontract states that "Contractor . . . may charge to [Subcontractor] any cost to complete, correct or becomes owed to Owner, plus *damages from delay or disruption, plus liquidated or actual damages* caused by Subcontractor's breach." (Dkt. 326-8 at 6.)

Defendants argue that the liquidated damages imposed on ECI by the City through the Prime Contract are consistent with the terms of the Subcontract. And, Defendants contend, "extended general conditions" damages provided by ECI are actual damages.[3] As such, Defendants maintain that under the subcontract, ECI can only receive either the "City of Minneapolis Damages" or "extended general conditions" damages.

Defendants' arguments are unavailing. The Subcontract states that "Contractor . . . may charge to [Subcontractor] any cost to complete, correct or [that] becomes owed to Owner, plus *damages from delay or disruption, plus liquidated or actual*

---

[3] Defendants refer to the "extended general conditions" damages here as "actual delay damages." (*See* Dkt. 325 at 26.) In doing so, Defendants seemingly concede that the damages at issue here are also delay damages. The Court presumes that Defendants are referring to "actual damages" in the disputed clause of the contract.

*damages.*" (Dkt. 326-8 at 6) (emphasis added). Defendants do not identify any provision in the contract or cite any case law to support the contention that the "extended general conditions" damages at issue here should be considered actual damages. As there is a genuine dispute as to any material fact as it relates to the categorization of these damages, Defendants fail to show that they are entitled to judgment as a matter of law. Defendant's motion for summary judgment on this issue is denied.

### 2. Standing to Recover Damages Pertaining to the Change Order

Defendants contend that ECI lacks standing to recover $2,583,041 from the change order provided by the City because the City did not properly assign this claim to ECI. In response to this argument, ECI maintains that it is not seeking recovery on behalf of the City for the change order. ECI argues that it incurred an additional $3,245,562 in costs following Bradshaw's breach. And ECI is seeking to recover $3,245,562 from Defendants. The $2,583,041 change order, ECI contends, was provided to ECI following Bradshaw's termination so that ECI would have sufficient funds to complete the project. Under The Common Interest and Cooperation Agreement, any money recovered by ECI up to $2,583,041 would be disbursed to the City. Viewing the evidence and drawing all reasonable inferences in the light most favorable to ECI, Defendants fail to establish that there is no genuine dispute as to any material fact. Accordingly, Defendants' motion for summary judgment as to ECI's lack of standing to recover $2,583,041 from the change order is denied.

### 3.      Whether the Liquidated Damages are Ripe

Defendants summary judgment on ECI's claim for liquidated damages assessed by the City, arguing that the money has not yet been collected and, therefore, the issue is not ripe for adjudication.

"A claim is not ripe for adjudication if it rests upon contingent future events that may occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (quotation omitted).  Although a plaintiff is not required to wait until the threatened injury occurs, the injury must be "certainly impending." *Paraquad, Inc. v. St. Louis Housing Auth.*, 259 F.3d 956, 958-59 (8th Cir. 2001).

ECI's claim for liquidated damages does not rest on the contingent future event that it might owe the City the liquidated damages. *See HCIC Enterprises, LLC v. United States*, 149 Fed. Cl. 297, 302 (2020) (Federal Claims Court concluding a claim is not ripe when liquidated damages have yet to be assessed).  The Prime Contract provides that ECI shall pay liquidated damages in the event of a delay.  It is undisputed that the City assessed liquidated damages against ECI and is requesting payment.  As the liquidated damages have been assessed, the injury to ECI is "certainly impending." *Paraquad, Inc.*, 259 F.3d at 958.  Additionally, Defendants lack any legal support for their argument that a party must *collect* the liquidated damages before standing can be established.  The amount of liquidated damages to the City is known and owed.  ECI has standing to bring a claim for the liquidated damages against Bradshaw.  As such, Defendants fail to show that they are entitled to summary judgment on ECI's claim for liquidated damages assessed by the City. Defendants' motion for summary judgment on this ground is denied.

**B.      ECI's Motion for Summary Judgment**

ECI moves the Court for summary judgment as to Bradshaw's counterclaims.[4] Bradshaw's counterclaims are as follows: (1) breach-of-contract, (2) wrongful-termination, (3) prompt-payment claim, (4) professional-negligence, (5) breach of express and implied warranty, (6) misappropriation-of-property, (7) request for attorneys' fees and (8) a bond claim.  ECI contends it is entitled to summary judgment on these claims because the claims are either foreclosed by the contract, statutorily barred or not recognized under Minnesota law.  Each claim is addressed in turn.

**1.      Breach-of-Contract Claim (Count I)**

ECI seeks summary judgment on Bradshaw's breach-of-contract claim to the extent that Bradshaw argues that Bradshaw was entitled to a change order based on the DSC claims submitted to ECI.

To prevail on a breach-of-contract claim, Bradshaw must show: "(1) formation of a contract, (2) performance by [Bradshaw] of any conditions precedent to his right to demand performance by [ECI], and (3) breach of the contract by [ECI]."  *Lyon Fin. Servs., Inc. v. Ill. Paper & Copier Co.,* 848 N.W.2d 539, 543 (Minn. 2014).

Here, the parties dispute the third element—whether ECI breached the Subcontract by failing to honor and accept Bradshaw's DSC claims.  For Bradshaw to succeed in this claim against ECI, Bradshaw must establish that its nonperformance was excusable and that ECI breached the contract first.  To be excusable, Bradshaw must establish that it was

---

[4] Travelers also made counterclaims, but ECI does not move for summary judgment on those counterclaims at this time.  (Dkt. 336 at 18 n.1.)

entitled to a change order.  Under the terms of the Subcontract, Bradshaw is "entitled to an equitable adjustment in Contract Price or Contract Times, or both, to the extent [that a differing site condition] . . . causes an increase or decrease in [Bradshaw's] cost of or time required for, performance of the Work."  (Dkt. 338-4 at 14.)  In other words, if Bradshaw brings valid DSC claims, Bradshaw is entitled to a change order.

ECI contends that Bradshaw's was not entitled to a change order because (1) Bradshaw's DSC claim notices were improper and (2) Bradshaw cannot meet the elements of a Type I DSC claim.

### a.      Sufficiency of the DSC Notices

The parties dispute whether Bradshaw's DSC claims were untimely pursuant to the terms of the Subcontract.  Bradshaw contends its claims were timely.

Under the terms of the Subcontract, if the subcontractor "believes" it has encountered a differing subsurface condition, the subcontractor must "notify Owner and Engineer in writing about such condition no later than three (3) days after the first observance of such condition."  (Dkt. 338-4 at 13.)[5]  If written notice is not given as required, than the subcontractor "shall not be entitled to any adjustment in the Contract Price of Contract Times with respect to [that] subsurface or physical condition."  (Dkt. 338-4 at 14.)  The subcontractor "shall not be entitled to any adjustment" if the subcontractor

---

[5] Bradshaw argues that the contract's notice provision should not be strictly interpreted. This argument is unavailing.  When contract language is "clear and unambiguous," the Court must enforce the contract as written and "should not rewrite, modify, or limit its effect by a strained construction."  *Luis v. RBC Cap. Markets, LLC*, 984 F.3d 575, 579 (8th Cir. 2020).

"failed to give written notice as required." (Dkt. 338-4 at 14.) If a DSC Claim is denied, "[a] denial of the Claim shall be final and binding unless within 30 days of the denial the other party invokes the procedures set forth in Article 17 for the final resolution of disputes." (Dkt. 338-3 at 66.)

Regarding the First DSC Claim, it is undisputed that Bradshaw first observed and encountered its first DSC event on November 7, 2019. But Bradshaw did not submit its First DSC Claim to ECI until November 15, 2019. Even when drawing all reasonable inferences in Bradshaw's favor, the First DSC Claim was untimely.[6] Bradshaw was not entitled to a change order for the First DSC Claim.

Regarding the Second DSC Claim, ECI contends that the second DSC was first observed during Bradshaw's work when Bradshaw experienced high jacking loads during drilling. According to ECI, the high jacking loads were also observed on December 29, 2019. But the record provides that the second DSC could have been first observed on January 1, 2020, when Bradshaw decided to stop tunneling. Bradshaw notified ECI on January 4, 2020, which is within the 3-day period and, therefore, timely. ECI has not shown that "there is no genuine dispute as to any material fact" as to when the second DSC was first encountered. Therefore, when all reasonable inferences are drawn in Bradshaw's favor, ECI fails to show that it is entitled to judgment as to a matter of law.

---

[6] Moreover, this untimely notice was partially acknowledged by Bradshaw. (*See* Dkt. 337-1 at 239.) Bradshaw's concerns on the timeliness of the filing led Bradshaw to consult its attorney. (Dkt. 337-1 at 158.)

In sum, the Court concludes that the First DSC Claim was untimely. However, a genuine dispute as to material facts exists as to whether the Second DSC Claim was untimely.

### b.    Elements of a DSC Claim

ECI also maintains that Bradshaw cannot meet the elements of a DSC claim under Minnesota Law. Because the Court concludes that the First DSC Claim was untimely, the Court evaluates only whether Bradshaw can meet the elements for the Second DSC Claim.

It is undisputed that Bradshaw makes a "Type I" DSC claim. Under Minnesota law, to prove a "Type I" DSC claim, a contractor must prove each of the following elements:

> i. the contract documents must have affirmatively indicated or represented the subsurface conditions which form the basis of the plaintiff's claim;
>
> ii. the contractor must have acted as a reasonably prudent contractor in interpreting the contract documents;
>
> iii. the contractor must have reasonably relied on the indications of subsurface conditions in the contract;
>
> iv. the subsurface conditions actually encountered, within the contract site area, must have differed materially from the subsurface conditions indicated in the same contract area;
>
> v. the actual subsurface conditions encountered must have been reasonably unforeseeable; and
>
> vi. the contractor's claimed excess costs must be shown to be solely attributable to the materially different subsurface conditions within the contract site.

*Frontier Pipeline, LLC v. Metro. Council*, No. A10-1437, 2011 WL 2982360, at *3–4 (Minn. App. July 25, 2011) (citing *Rice Lake Contracting Corp. v. Rust Env't & Infrastructure, Inc.*, 616 N.W.2d 288, 293 (Minn. App. 2000) . "A contractor is not eligible for an equitable adjustment for a Type I differing site condition unless the contract indicated what that condition would be." *Comtrol, Inc. v. United States*, 294 F.3d 1357, 1363 (Fed. Cir. 2002); *see also Frontier Pipeline*, 2011 WL 2982360, at *3–4. It is undisputed by the parties that the GBR:

- Set baselines for geotechnical conditions and material behavior that can be assumed to be encountered during construction;

- Identified important design and construction considerations, key project constraints, and selected requirements to be addressed by contractors during bid preparation and construction;

- Provided guidance to Owner and their representatives in administering the Contract;

(Dkt. 347-5 at 4.) Moreover, "[t]he GBR is the sole document for geotechnical interpretations for the Project and provides the basis for determining the merit of claims for differing site conditions." (Dkt. 347-5 at 4.)

It is undisputed that the GBR did not directly address the tunnel voids discussed in the Second DSC Claim. ECI argues that because the GBR does not affirmatively make any representation to the tunnel voids discussed in Bradshaw's Second DSC Claim, Bradshaw is not entitled to an adjustment. Bradshaw disagrees, contending that ECI's argument oversimplifies the issues that Bradshaw experienced. In support of this argument,

Bradshaw asserts that the tunnel voids are directly tied the ground water inflows, which were discussed in the GBR, and thus were represented in the GBR.

As the GBR does not address the tunnel voids, "it cannot be said that [Bradshaw] encountered conditions materially differing from those specifically indicated in the specification." *See Comtrol, Inc.*, 294 F.3d 1357 at 1363.  Moreover, Bradshaw's attempts to tie the tunnel voids with the ground water inflows representations are unavailing because Bradshaw fails to provide any factual or legal support for this claim.  Because ECI has met its burden of production, Bradshaw "must do more than simply show that there is some metaphysical doubt as to the material facts." *Scott*, 550 U.S. at 380.  However, Bradshaw fails to do so.  As such, ECI has established that it is entitled to judgment as a matter of law on the Second DSC Claim.  The Court, therefore, grants ECI's Motion for Summary Judgment on this issue.

Bradshaw failed to raise the First DSC Claim in a timely manner.  And pertaining to the Second DSC Claim, the GBR does not address tunnel voids.  Accordingly, the Court grants ECI summary judgment on Bradshaw's breach-of-contract claim against ECI.

## 2.    Wrongful-Termination Claim (Count II)

Bradshaw argues that ECI wrongfully terminated Bradshaw.  ECI presents two arguments in its defense.  ECI contends that the Subcontract entitled ECI to terminate Bradshaw's employment "for cause."  Alternatively, ECI maintains that Bradshaw's wrongful termination claim fails because ECI was entitled to terminate Bradshaw's employment "for convenience."

The Subcontract provides "Contractor may terminate or suspend Subcontractor's Work, all or in part, if Owner terminates any Work, upon Subcontractor's material breach, or for convenience. Subcontractor shall be in material breach if, after five (5) days' written notice, Subcontractor . . . unreasonably fails to complete or proceed with Work per schedule; [or] tells Contractor that it will not perform." (Dkt. 347-6 at 5.)

ECI contends that it was entitled to terminate Bradshaw for cause for two reasons: Bradshaw unreasonably failed to complete or proceed with the work according to the schedule and Bradshaw stated it would not perform its work. ECI, however, provides no support to show that the delays were unreasonable. Moreover, Bradshaw presents evidence that Bradshaw persistently attempted to microtunnel despite the struggles it encountered. Additionally, Bradshaw did not state that it would not perform its work. Bradshaw informed ECI that it would stop its tunneling operations while Bradshaw and outside experts "investigated to determine the best solution," and Bradshaw sought guidance from ECI and the City on how to proceed.

Alternatively, ECI's argues that it was entitled to terminate Bradshaw "for convenience." This argument is unavailing because ECI never invoked this clause. The record establishes that ECI terminated Bradshaw "for cause." But ECI did not invoke the "for convenience" clause. Moreover, ECI cites no case law to support its contention that it is entitled to judgment as a matter of law when a "for convenience" clause exists but is not invoked. As such, ECI's motion for summary judgment on Bradshaw's wrongful termination claim is denied.

### 3.  Prompt-Payment Claim (Count III)

Bradshaw contends that ECI violated Minn. Stat. § 337.10(3) by failing to pay 1.5% in interest on any payment amount owed as of January 9, 2020.  ECI argues that it does not owe any interest because the statute only provides interest for undisputed services provided and ECI contends that Bradshaw's services are still in dispute.  A prime contractor is required to:

> to promptly pay any subcontractor . . . within ten days of receipt by the party responsible for payment of payment for undisputed services provided by the party requesting payment . . . . The contract shall be deemed to require the party responsible for payment to pay interest of 1-1/2 percent per month to the party requesting payment on any undisputed amount not paid on time . . . . A party requesting payment who prevails in a civil action to collect interest penalties . . . must be awarded its costs and disbursements, including attorney fees

Minn. Stat. § 337.10(3).  To prevail, Bradshaw must prove at trial that it requested payment from ECI for undisputed services and that ECI failed to pay Bradshaw services within ten days of receiving that request.  *See Meyer Contracting, Inc. v. Fowler*, No. A18-0785, 2019 WL 2494782 at *3 (Minn. Ct. App. 2019).  ECI claims that summary judgment should be granted because all of Bradshaw's work is disputed.  And because the work is still disputed, ECI argues that Bradshaw is not entitled to interest under Minn. Stat. § 337.10(3).  Bradshaw argues that interest is owed for a late payment that was due on January 10, 2020, but paid on February 6, 2020.

Although ECI argues that all of Bradshaw's work is disputed,  the summary judgment record fails to establish that there are no outstanding payments still owed to

Bradshaw.    Accordingly, ECI's motion for summary judgment on Bradshaw's prompt-payment claim is denied.

### 4.    Professional-Negligence Claim (Count IV)

Bradshaw contends that ECI committed professional negligence in ECI's construction of the launch shaft.   Summary judgment should be granted, ECI argues, because Bradshaw fails to establish a *prima facie* case of professional negligence under Minn. Stat. § 544.42, subd. 2 as Bradshaw failed to provide two expert disclosures as required to bring such claims.  Bradshaw agrees that that summary judgment is appropriate because it failed to meet the pleading requirements.  ECI's motion for summary judgment regarding Bradshaw's professional-negligence claim is granted.

### 5.    Warranty Claim (Count V)

Bradshaw contends that ECI breached both express and implied warranties of their contract.   ECI argues Bradshaw's arguments fail for two reasons: (1) ECI expressly disclaimed any warranties regarding the subsurface conditions and (2) Bradshaw was responsible for its own means and methods, so no warranty was implied.  (Dkt. 336 at 33.)

ECI argues that the Contract Documents disclaimed all express and implied warranties regarding the subsurface conditions.  In support of this argument, ECI points to Sections 5.03(C)(3), 5.03(C)(6), and 5.03(C)(9) from the Supplementary Conditions. Section 5.03(C)(6) provides the warranty statement states:

> Neither *Owner, Engineer, nor geotechnical or other consultant* warrants or guarantees that actual subsurface conditions will be as described in the GBR, nor is the GBR intended to warrant or guarantee the use of specific means or methods of construction.

(Dkt. 338-4 at 11.) (emphasis added).  ECI is commonly referred to as "Contractor" within the Contract Documents.[7]  As ECI does not expressly disclaim these warranties, the Court concludes summary judgment is not appropriate.

ECI argues that regardless of any warranty, Bradshaw was solely responsible for the means, methods, techniques, sequences, and procedures of performing its microtunneling work thus no warranty was implied.  Bradshaw, however, provides that it was bound to build in accordance with the City's specifications.

"[W]here one party furnishes specifications and plans for a contractor to follow in a construction job, he thereby impliedly warrants their sufficiency for the purposes implicit therein and whether the builder has been damaged in proceeding with the work in reliance on such an implied warranty or whether he was damaged in relying on the warranty in making his bid, he may recover."  *Granite Re, Inc. v. City of La Crescent*, No. 08-cv-441(RHK/RLE), 2009 WL 2982642, at *8 (D. Minn. Sept. 11, 2009) (citing *McCree & Co. v. State*, 91 N.W.2d 713, 724 (Minn. 1958)).

In the Standard General Conditions of the Construction Contract, Bradshaw is solely responsible for the "means, methods, techniques, sequences, and procedures" of performing its microtunneling work.  However, excerpts from the Project Manual provide the manner that Bradshaw was required to perform its work.  In viewing evidence in the light most favorable to the Bradshaw, ECI fails to show that it is "entitled to judgment as

---

[7] Similarly, the GBR only states: "The contractual baselines do not represent warranties by Owner of the actual subsurface conditions that will be encountered by Contractor."  (Dkt. 338-1 at 60.)

a matter of law" as to whether Bradshaw had discretion to deviate from the specifications provided.  Accordingly, ECI's motion for summary judgment on Bradshaw's express and implied warranties claims is denied.

### 6.    Misappropriation of Property (Count VI)

Bradshaw brings a claim for misappropriation of property, arguing that ECI improperly refused to allow Bradshaw onto the Project site to recover its equipment that remained on-site. ECI argues that misappropriation of property is not a tort that is recognized by Minnesota law.

Minnesota does not recognize the common law tort of misappropriation of property. In support of its claim that misappropriation of property exists, Bradshaw cites to *State v. Kiewel*, 217 N.W. 598, 600 (Minn. 1928).  (Dkt. 345 at 42.)  However, *Kiewel* is a criminal matter that addresses embezzlement.  Bradshaw also incorrectly cites to *World Data Products, Inc. v. Keefe*, No. C2-99-644, 1999 WL 1037992, *4 (Minn. Ct. App. 1999), which addresses misappropriation of trade secrets, and *RMG Partners, LLC v. Arctic Cat Sales Inc.*, Case No. 20-CV-609 (NEB/LIB), 2021 WL 4226070, *1 (D. Minn. Sept. 16, 2021), which addresses misappropriation of intellectual property.  None of these cases stand for Bradshaw's position that Minnesota recognizes misappropriation of property as a tort.   Accordingly, ECI's motion for summary judgment on Bradshaw's misappropriation-of-property claim is granted.

### 7.    Bond Claim (Count VIII)

Bradshaw's bond claim seeks to recover from a payment bond owned by ECI.  ECI argues that Bradshaw's bond claim fails because payment can only be made when a claim

is substantiated. Bradshaw contests this claim by arguing that the bond is a guarantor of performance by ECI. Bradshaw argues that if one of its other counterclaims move forward, Bradshaw's bond claim should move forward as well because the bond serves as guarantor of ECI's obligations.

Under Minn. Stat. § 574.26,

> a contract with a public body for the doing of any public work is not valid unless the contractor gives (1) a performance bond to the public body with whom the contractor entered into the contract, for the use and benefit of the public body to complete the contract according to its terms, and conditioned on saving the public body harmless from all costs and charges that may accrue on account of completing the specified work, and (2) a payment bond for the use and benefit of all persons furnishing labor and materials engaged under, or to perform the contract, conditioned for the payment, as they become due, of all just claims for the labor and materials

Here, because some of Bradshaw's claims survive summary judgment, ECI's summary judgment motion on Bradshaw's bond claim is denied.

**8.    Attorneys' Fees Claim (Count VII)**

Bradshaw seeks attorneys' fees. ECI maintains that attorneys' fees are not recoverable unless authorized by contract or by statute. Bradshaw is not seeking attorneys' fees pursuant to the Subcontract. Rather Bradshaw contends that fees are statutorily mandated under Minn. Stat. § 574.26. Under the statute, reasonable attorneys' fees, costs, and disbursements may be awarded in an action to enforce claims under the act if the action is successfully maintained or successfully appealed. Minn. Stat. § 574.26.

Here, because Bradshaw's bond claim survives summary judgment, Bradshaw's attorneys' fee claim survives as well.  Accordingly, ECI's summary judgment motion on Bradshaw's attorneys' fees claim is denied.

## ORDER

Based on the foregoing analysis and all the files, records and proceedings herein, **IT IS HEREBY ORDERED**:

1.    Defendants' motion to exclude the testimony of Arthur McGinn, (Dkt. 309), is **DENIED**;

2.    Defendants' motion to exclude the testimony of Mark Gentry, (Dkt. 315), is **DENIED**;

3.    ECI's motion to exclude the testimony of Donald Bergman, (Dkt. 328), is **GRANTED** to the extent that he will be opining on engineering and geological topics beyond his area of expertise and **DENIED** in all other respects;

4.    ECI's motion to exclude the testimony of Kimberlie Staheli, (Dkt. 328), is **DENIED**;

5.    ECI's motion to exclude the testimony of Scott Bender, (Dkt. 328), is **DENIED**;

6.    Defendant's motion for summary judgment, (Dkt. 323), is **DENIED**; and

7.    ECI's motion for summary judgment, (Dkt. 334), is **GRANTED in part and DENIED in part** as addressed herein.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: September 25, 2023                         s/Wilhelmina M. Wright
                                                                  Wilhelmina M. Wright
                                                                  United States District Judge